NO. 07-04-0344-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



JULY 7, 2004



______________________________




IN RE: JUDY LAWRENCE, AS TRUSTEE OF THE A. M. & J., 


COLDWATER, AND RED RIVER TRUSTS, RELATOR


_______________________________



Before QUINN and REAVIS and CAMPBELL, JJ.

MEMORANDUM OPINION


 Judy Lawrence, as Trustee of the A.M. & J., Coldwater, and Red River Trusts,
relator, proceeding pro se, commenced this original proceeding by filing a "Petition for an
Emergency Writ of Mandamus" and "Motion for Temporary Relief and Stay of
Proceedings." It is the latest in a series of petitions relator has filed concerning the same
subject. We will dismiss the petition for want of jurisdiction in part and deny it in part. 

 While relator's petition states various claims and complaints, her prayer for relief
requests we order respondent, the Honorable Ron Enns, Judge of the 69th Judicial District
Court, Dallam County, to take actions to enforce an opinion and judgment issued by this
Court on March 14, 1995, in Cause Number 07-94-0178-CV.

 Relator also requests that we order attorney Kyle Lewis and his client, Eddie
Stafford, (1) who are not named as respondents in the petition, to "immediately cease their
unlawful and fraudulent actions." In addition, relator requests that we order Mr. Stafford to
return property in Alamosa County, Colorado, in contravention of a judgment issued by the
District Court of Alamosa County. (2) 

 Relator and a co-trustee presented a similar request in January 2004 in the form of
a "Complaint for an Emergency Preliminary Injunction and Permanent Injunctive Relief [And
Damages]." (3) Dismissing that proceeding for want of jurisdiction, we explained:

 [T]he judgment of an appellate court is enforced at the trial court level after
the mandate from the appellate court is received by the trial court clerk and
the process of enforcing the judgment commences. Mandate in our 1995
decision was issued on May 24, 1995. . . . Because our mandate in the
referenced proceeding was issued in 1995, we have no jurisdiction to grant
the relief requested.


 Relator filed a similar petition, seeking a writ of mandamus, with this Court on April
19, 2004. That petition was denied. (4) 


 A court of appeals has the authority to issue a writ of mandamus against a judge of
a district or county court in the court of appeals' district and all writs necessary to enforce
its jurisdiction. Tex. Gov't Code Ann. § 22.221(a),(b) (Vernon 2004). We have jurisdiction
to issue a writ of mandamus to Mr. Lewis and Mr. Stafford, then, only to the extent
necessary to enforce our jurisdiction. Relator's petition points out that there is currently
pending before this Court (5) an appeal of trial court action in a case apparently involving
possession of the same property as is described in relator's petition, and that there are
pending in the 69th District Court, Dallam County, two actions also involving that property. 
Relator's petition does not explain, though, and we do not perceive, that issuance of the
writ relator seeks is necessary to enforce our appellate jurisdiction. In these
circumstances, we have no jurisdiction to grant relator's petition seeking writ of mandamus
addressed to Kyle Lewis and Eddie Stafford. 

 A writ of mandamus is an extraordinary remedy that will issue (1) only to correct a
clear abuse of discretion or the violation of a duty imposed by law, when (2) there is no
other adequate remedy by law. See Canadian Helicopters Ltd. v. Wittig, 876 S.W.2d 304,
305 (Tex. 1994) (orig. proceeding); Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992)
(orig. proceeding). Such a limitation on the issuance of writs of mandamus is necessary
to preserve orderly trial proceedings and prevent constant interruption of the trial process
by appellate courts. See Canadian Helicopters, 876 S.W.2d at 305. In most
circumstances, an appeal will provide an adequate remedy for any trial court error, making
mandamus relief unavailable. See id at 306. It is the relator's burden to show entitlement
to the relief being requested. See generally Johnson v. Fourth District Court of Appeals,
700 S.W.2d 916, 917 (Tex. 1985) (orig. proceeding). 

 Although it is not clear that relator seeks relief in her present petition directing Judge
Enns to consider and act on the Complaint for Emergency Preliminary Injunction,
Permanent Injunctive Relief, and __Damages__ relator filed in the trial court's cause
number 10178 (as did her April 19, 2004 petition), relator's petition discusses that pleading
and others she has filed in that cause. 

 We denied relator's April 19, 2004, petition because she did not demonstrate her
entitlement to mandamus relief. Nor does this present petition demonstrate entitlement to
mandamus relief directing the trial court to take any action with respect to relator's
pleadings filed in cause number 10178. Relator refers in her petition to an April 22, 2004,
letter to Judge Enns, but no copy of the letter accompanies her petition, nor does her
petition show that the letter was brought to his attention. See In re Chavez, 62 S.W.3d 225,
228 (Tex.App.-Amarillo 2001) (orig. proceeding). Relator's petition refers also to a
stipulation dated February 18, 2004, and filed in cause number 10178. She contends her
signature on the stipulation was obtained by coercion, and that it should be stricken. 
Resolution of such a question likely would involve the reconciliation of disputed factual
matters, which is not permitted in a mandamus proceeding. See Hooks v. Fourth Court of
Appeals, 808 S.W.2d 56, 60 (Tex. 1991) (orig. proceeding). 

 Finally, relator's petition refers also to a partition action pending in trial court cause
number 10238 and a related cause, 10238-A. The petition does not demonstrate, though,
why relator does not have an adequate remedy through appeal of a judgment entered in
that cause for the errors she perceives. Mandamus relief is not available unless that
requirement is satisfied. Canadian Helicopters, 876 S.W.2d at 305. 

 To the extent "Relator's Petition for Emergency Writ of Mandamus" seeks a writ of
mandamus addressed to Kyle Lewis and Eddie Stafford, it is dismissed for want of
jurisdiction; to the extent it seeks a writ addressed to the Honorable Ron Enns, District
Judge, 69th Judicial District Court, Dallam County, it is denied. Relator's "Motion for
Temporary Relief and Stay of Proceedings" filed with her petition, and the second motion
of the same title filed this date, are denied as moot.

 

 Per Curiam

 

1. Eddie Stafford is independent administrator for the Estate of Alex Stafford,
Deceased. Kyle Lewis is attorney for Mr. Stafford in his capacity as independent
administrator. 
2. The judgment vested title to the property in the Estate of Alex Stafford, Deceased.
3. In re Greenstreet, No. 07-04-0015-CV, 2004 Tex.App. LEXIS 477
(Tex.App.-Amarillo January 16, 2004) (orig. proceeding).
4. In re Lawrence, No. 07-04-0239-CV, 2004 Tex.App. LEXIS 3518
(Tex.App.-Amarillo April 20, 2004) (orig. proceeding).
5. The pending appeal is No. 07-04-00262-CV, on appeal from the Dallam County
Court, Dallam County, Texas.


on of his second point unnecessary. We turn to the question of harm.

 To determine if the admission of Higgins' testimony requires reversal, we will apply
the standard for nonconstitutional errors set out in Rule of Appellate Procedure 44.2(b). 
See Bagheri v. State, 119 S.W.3d 755, 762-63 (Tex.Crim.App. 2003) (applying 44.2(b)
standard to erroneous admission of evidence); Potier v. State, 68 S.W.3d 657, 663
(Tex.Crim.App. 2002) (erroneous evidentiary rulings rarely constitutional error). That
standard requires us to disregard any error which does not affect a substantial right. Tex.
R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and
injurious effect or influence in determining the jury's verdict. King v. State, 953 S.W.2d
266, 271 (Tex.Crim.App. 1997). If, conversely, after examining the record as a whole, we
have "fair assurance that the error did not influence the jury, or had but a slight effect," the
erroneous admission of evidence did not affect a substantial right. Johnson v. State, 967
S.W.2d 410, 417 (Tex.Crim.App. 1998). 

 To assess the likelihood that the jury's decision was adversely affected by the
erroneous admission of Higgins' testimony, we consider the entire record, including the
other evidence admitted, the nature of the evidence supporting the verdict, and the
character of the error in light of the other evidence in the case. Motilla v. State, 78 S.W.3d
352, 357-58 (Tex.Crim.App. 2002) (evaluating harm from erroneously admitted evidence). 
We also consider the arguments of counsel and the extent to which the State emphasized
the improper evidence. Id. at 357; Morales v. State, 32 S.W.3d 862, 867 (Tex.Crim.App.
2000).

 Here, we find the character of the error, considered in the context of other evidence
before the jury, to be an important factor. The hearsay testimony was Higgins' recitation
of what Anita told her during their interview three days before, concerning appellant's four-year history of sexual assaults on Anita. She said Anita related that appellant first sexually
assaulted her through forced sexual intercourse when she was eighteen, and after that he
did so with increasing frequency to the point that he eventually sexually assaulted his
daughter "daily," except when she was ill or menstruating. 

 The trial court sustained appellant's objections to questions seeking to elicit
testimony from Anita about this history of sexual offenses against her, and sustained his
objections to the same questions addressed to counselor Kennedy. Higgins thus provided
the only testimony about the frequent sexual assaults occurring during the four-year period
before the indicted offense. This testimony, coming from the State's first witness, certainly
set the stage for Anita's description of the assault for which appellant was indicted. But
Higgins simply was telling the jury what Anita told her. From our review of the entirety of
the testimony, we conclude that Anita's credibility before the jury was the critical element
of the State's case. The jury heard direct testimony about the indicted offense only from
Anita, and if the jury did not believe her testimony, we find it unlikely they would believe she
nonetheless was truthful when she told Higgins three days before that appellant assaulted
her many times. 

 The State also points to other evidence of appellant's sexual misconduct toward
Anita occurring over a period of years, and argues that evidence diminished the effect of
the trial court's error. As previously noted, before appellant voiced an objection, Anita
responded with "18" to questioning asking how old she was when "the sexual offense
began." (3) The State also notes that appellant does not complain on appeal about testimony
that appellant touched Anita's breast or pubic area inappropriately during her teenage
years, put his hand under her shirt while they were lying on the couch watching television,
once looked up Anita's shorts while she was changing a lightbulb and sometimes swatted
her "on the butt." Anita testified some of these actions "didn't feel right." She also testified
to statements by appellant that he would "never do it again." (4) The State contends this
testimony, when compared with Higgins' inadmissible hearsay testimony of four years of
frequent sexual assaults, is "the same or similar evidence," admitted at trial without
objection, making admission of Higgins' testimony harmless. (5) We cannot agree with this
contention by the State, but we find the evidence that appellant's sexual misconduct toward
Anita occurred over a period of time diminished somewhat the effect of the trial court's
error.

 At the time of trial, Anita was twenty-seven. During her testimony, she described
her father's controlling, abusive and violent actions toward her and her siblings while they
lived at home. By the time of the indicted offense in March 2000, she was the only child
living with her parents. She testified to her fear of her father, and to the depression and
lack of self-esteem she felt. She told the jury that appellant once fractured her arm when
she "told him that if he didn't stop what he was doing, that I was going to go to my mother."
With respect to the events of March 9, 2000, she testified "actually that night was the last
night he ever did anything to me." She described, in narrative fashion, that she and
appellant were alone after her mother went to work that evening. She and appellant had
argued during supper over his suspicions she was planning to move from the home. They
later continued to argue, with appellant accusing Anita of sleeping with other men. She
then described how he grabbed her arm, picked her up and took her to the back room
where, despite her struggling, crying, and telling him to stop, he "raped me." (6) Afterward,
she testified, she could not stop crying, and appellant "told me to be quiet, stop acting like
a baby and to go get cleaned up." As noted, shortly thereafter, with the help of co-workers,
she moved out of her parents' home. 

 Testifying further, Anita described her life since moving from her parents' home, and
said she reported appellant's actions in August 2004. Asked why it took her so long to
make a report, she responded, "Because I wasn't strong enough to deal with it. When I left
home I blocked a lot of this out thinking that it would go away and it didn't. No matter what
I did, it never went away, and it affected my life."

 Appellant's cross-examination of Anita focused on her relationship with her father
during the years after she moved from her parents' home, seeking to show her lack of fear
of him. Appellant introduced several family photographs showing Anita with appellant, and
appellant with Anita's daughter. (7)

 Among other witnesses, the State also presented the testimony of Anita's co-workers who related their observations of appellant's unusual behavior toward Anita while
she worked at the preschool, her apparent fear of him, their concerns for Anita's welfare,
their offers to help Anita move out of her parents' home, and events surrounding her move. 

 Anita's testimony, if found credible, amply supported the jury's guilty verdict. The
State did not emphasize Higgins' testimony in closing argument, but emphasized the
evidence supporting the indicted offense. Considering the nature of Higgins' testimony in
the context of all of the evidence before the jury, we conclude that it did not have a
substantial and injurious effect or influence in determining the jury's guilty verdict.

 Review of the record compels the same conclusion with regard to the effect of
Higgins' testimony on the jury's decision to assess the maximum sentence of ninety-nine
years. Anita testified again during the punishment phase, relating to the jury a history of
sexual assaults at the hands of her father, beginning at the age of 18 or 19 and continuing
through the March 2000 indicted offense. With regard to the punishment phase of trial, this
presentation of the same evidence as that improperly presented earlier through Higgins'
testimony rendered the trial court's error harmless. Perez, 133 S.W.3d at 831. Moreover,
Anita's oldest sister Margarita testified that appellant sexually abused her, beginning with
digital penetration of her vagina when she was eight and advancing to forced sexual
intercourse when she was ten. Margarita and their youngest sister Mary also told of an
occasion on which Mary witnessed appellant's sexual intercourse with Margarita, when
Margarita was fifteen. (8) Anita's sisters, and her two brothers, also testified to the physical
abuse appellant inflicted on them and their mother. Evidence was presented that the two
youngest children were removed from the home because of appellant's abuse. Having
considered the entire record, we conclude the trial court's erroneous admission of Higgins'
testimony had no substantial effect on the jury's verdict on punishment.

 Accordingly, we find the error of which appellant complains did not affect his
substantial rights and must be disregarded. Tex. R. App. P. 44.2(b); King, 953 S.W.2d at
271. His points of error are overruled, and the judgment is affirmed.


 James T. Campbell 

 Justice




Quinn, C.J., concurring as to result.




Publish. 
1. The State initially responds that appellant waived his appellate complaints by
failing to object timely when the same evidence was introduced during the victim's
testimony. It points to Anita's testimony that "the sexual offense" began when she was
eighteen years old. We do not agree that appellant's objection to the testimony was
untimely. The relevant portion of the reporter's record reveals this exchange during Anita's
testimony:


 Prosecutor: Okay. Now, at some point in time, the sexual offense began; is that
correct?


 A: Yes.


 Q: And approximately how old were you?


 A: 18.


 Defense counsel: I'd have to - I'd like to renew my extraneous [offense] objection
at this time, your honor, the one we've made in limines and have had many
arguments about, I'd like to make it now. 


 The court: If counsel would approach.


 The court: You're not going to have her talk about other sexual relations are you,
specifically?


 Prosecutor: I'm going to talk about the specific instances, the first time that it
happened. 


 The court: Is that the one indicted for?


 Prosecutor: No. Your honor, - -


 The court: That's dangerous. 


The trial court sustained the objection. The objection was timely because the prosecutor's
inquiry about when "the sexual offense" began could have referred to the offense for which
appellant was being tried. See Hughbank v. State, 967 S.W.2d 940, 944 (Tex.App.--Fort
Worth 1990, no pet.) (objection required as soon as ground for objection becomes
apparent).
2. This case does not involve a contention that statements made to a licensed
professional counselor like Higgins are outside the scope of Rule 803(4), and we need not
express an opinion on that question here. Cf. Perez, 113 S.W.3d at 830 (statements made
to licensed professional counselor not working under supervision of medical professional
were not made for purpose of medical diagnosis or treatment) with Wilder v. State, 111
S.W.3d 249, 256 (Tex.App.-Texarkana 2003, pet ref'd) (finding statements made to
licensed professional counselor admissible under Rule 803(4)). 
3. Although appellant objected immediately after Anita's response, the response
nonetheless was before the jury.
4. In response to an objection, the State argued this testimony did not violate the trial
court's previous ruling on extraneous offenses because Anita was there referring to
physical, not sexual, abuse. In its context, we find the jury easily could have considered
Anita to be referring there to appellant's sexual assaults of her. No appellate issue is
presented regarding testimony from any witness but Higgins. 
5. See Perez, 113 S.W.3d at 831 (improper admission of evidence not reversible
error when same facts proved by other properly admitted evidence), citing Brooks v. State,
990 S.W.2d 278, 287 (Tex.Crim.App. 1999). 
6. Asked specifically what appellant did, she said, "He . . . stuck his penis in my
vagina, he raped me and then he pulled out right before he came."
7. Except for the introduction of the photographs, appellant's case was presented
only through cross-examination.
8. Mary's testimony indicates appellant was unaware that she was witnessing his
assault of Margarita.