Criminal Case Template







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



JOSE GARCIA,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§

§

§

§

§

No. 08-03-00351-CR

Appeal from the

168th District Court

of El Paso County, Texas

(TC# 20020D01878)




O P I N I O N

           This is an appeal from jury convictions for one count of intoxication manslaughter,
and one count of intoxication assault. The jury assessed punishment at ten years’ community
supervision for the intoxication manslaughter count, and two years’ confinement and a
$10,000 fine for the intoxication assault count. We affirm the judgment of the trial court. 
I. SUMMARY OF THE EVIDENCE
           On November 29, 2001, Deputy Luis Rodriguez, of the El Paso County Sheriff’s
Department, responded to a dispatch at Interstate 10 (I-10) in reference to a vehicle driving
west in an eastbound lane. According to the dispatch, the vehicle had been traveling in the
wrong direction for approximately eight miles. At the time of the dispatch, Deputy
Rodriguez was driving south on Horizon Boulevard. When he arrived at I-10, between mile
marker 27 and 28, he observed a collision on the eastbound lane. Rodriguez observed two
vehicles about 400 feet apart, a white Honda engulfed in flames, and an overturned extended-cab pickup truck.
           Deputy Paul Soria, of the El Paso Sheriff’s Department, also responded to the dispatch
regarding a vehicle traveling west in the eastbound lane of I-10. By the time Soria reached
the vehicle, it was already involved in an accident. Soria saw a vehicle on fire, was told
someone was in the flame-engulfed car, and proceeded in pulling that person out. Deputy
Soria also witnessed a truck that had rolled over further down the road. He observed that the
Appellant, Jose Garcia, was trapped inside the cab of the truck. After speaking to Appellant,
Deputy Soria went to help Alfredo Parra, the passenger of the pickup truck. Soria checked
Parra for responsiveness and found him to be deceased. The deputy testified that the physical
evidence indicated that Appellant had been driving on the wrong side of the freeway.
           Dung Truong was the driver of the Honda vehicle. She testified that she was passing
through El Paso, while on her way to San Antonio, at approximately 2 or 3 a.m. She had not
been drinking and was wide awake. Before the collision occurred, Truong remembered
seeing lights and assumed the lights came from an off-the-road work crew. Truong did not
remember the collision. However, she did remember the car being engulfed in flames and
waking up in the hospital. Truong survived, but received injuries from the accident.           The Appellant was also injured and had to be extricated from the pickup truck. Once
Garcia was free from the vehicle, he was treated by a paramedic. Elizabeth Joanne Mitchell
stated that she worked for Life Ambulance and was assigned to treat the Appellant who was
the driver of the overturned vehicle. Mitchell testified that both she and her partner, Chris
Villegas, noticed there was an odor of alcohol about Appellant. She went on to say that
Appellant repeatedly asked about the other person that had been in his vehicle. Mitchell
explained repeatedly asking such a question is typical of patients who are either intoxicated
or suffering from a head injury. Mitchell further testified that she did not believe Appellant
suffered from any head injuries.
           Deputy Soria also smelled alcohol on Garcia, as well as inside of the pickup truck. 
Soria testified that beer cans were found on the road where the accident took place. He also
witnessed empty beer cans and a case of Budweiser inside Appellant’s vehicle.
           Deputy Ryan Urrutia from the Specialized Traffic Investigation Unit was also present
at the scene of the accident. Urrutia witnessed clothes and beer on the road. The deputy
testified that he believed there were 12-ounce cans of beer inside the Appellant’s truck and
a container for them. After leaving the investigation scene, Urrutia went to Thomason
Hospital to visit the victim and Appellant. While visiting Appellant, Urrutia made
arrangements to meet him on December 13 to obtain a statement from him in reference to the
investigation of the accident. At that time, Appellant, after being read his Miranda rights and
agreeing to waive those rights, gave a written statement.
           In Appellant’s statement, he stated that on November 28, he woke up with only four
hours of sleep, at about 10 a.m. He stated he had only slept four hours because he had been
to Margarita’s nightclub the night before. At 3 p.m., Appellant picked up Alfredo Parra and
drove him to the bank. Between 4 p.m. and 5 p.m., Appellant ate a burrito and drove to his
cousin’s house. Her name was Hilda Cordova. Appellant explained that he was separating
from his wife and was in the process of moving in with Cordova. After Appellant moved his
belongings into the cousin’s house, both he and Parra decided to go to Tequila Sunrise,
arriving there between 5:10 p.m. and 5:15 p.m. While at Tequila Sunrise, Garcia and Parra
both consumed four beers and left the strip bar at around 8:30 p.m. They stopped at
Diamond Shamrock, bought a 12-pack of Bud Light beer, and proceeded to Anthony, New
Mexico to turn on his estranged wife’s heater. On the way to her house, Garcia and Parra
drank three beers. Appellant arrived at his wife’s house between 9 to 9:15 p.m., but failed
to turn on the heater because his wife felt he arrived too late. Then, between 9:20 and 9:50,
Appellant and Parra stopped at Parra’s house, where they used the restroom and Parra did
two lines of cocaine.
           Appellant further related in his statement that after leaving Parra’s house, he and Parra
drove back to the Tequila Sunrise bar. While driving to the bar, they both drank two more
beers, drove by a friend’s home, and decided to stop by a 7-Eleven to buy an 18-pack of Bud
Light beer. They did not open the 18-pack because they still had two beers from the 12-pack
they purchased earlier. At 10:30 they arrived at the parking lot of Tequila Sunrise, where
they drank the remaining two beers. While inside the bar, Appellant and Parra drank one
more beer.
           By 11:20, Appellant and Parra had left Tequila Sunrise and had arrived at the Cabaret
nightclub. While at the gentleman’s club, Appellant and Parra both drank five beers each. 
Appellant and Parra stayed at Cabaret nightclub until 2:10. Appellant decided to drive
himself and Parra back to his cousin’s house. On the way to Appellant’s cousin’s house, he
mistakenly passed the Zaragosa exit. Appellant kept driving on I-10 and noticed that Parra
had fallen asleep. Appellant stated in his statement that after getting off the Americas exit,
he did not remember what happened next. He did, however, remember a paramedic pulling
him out of his truck, being in the hospital, and asking for information about Parra.
           While Garcia received care at the hospital, Giovanna Oropeza, a registered medical
assistant at Thomason Hospital, collected Appellant’s blood. She testified that blood was
drawn in a sanitary place and in accordance with proper procedures. After she collected and
labeled the blood sample, she took it to the lab. At the lab, the blood sample was placed in
a centrifuge and “spinned down.” The State offered Appellant’s medical records through this
witness. These records included the result of a blood-alcohol test that had been performed
at the hospital. Appellant objected that the State had failed to fulfill the predicate for
admission of the scientific evidence; that is, the blood-alcohol test. The court reserved ruling
on the objection.
           Dr. Corinne Stern, the chief medical examiner for El Paso County, testified that she
performed an autopsy on the deceased, Alfredo Parra. She related that toxicology tests were
performed on Parra and the tests revealed that Parra had alcohol and cocaine in his system. 
Parra had a blood-alcohol level of .23. She testified that it would take four to five drinks for
an average-sized male to reach a blood-alcohol level of .08. Dr. Stern testified that she had
examined Appellant’s written statement and medical records. When asked if she had formed
an opinion as to Appellant’s blood-alcohol level, Appellant objected that the scientific
predicate had not been established regarding the test results.
           Outside the presence of the jury, the witness testified that she was familiar with the
lab tests done at Thomason Hospital, that those tests were relied on by other medical
professionals, that other medical professionals had found the tests to be reliable, and that she
herself found them to be reliable. She related that the specific test that was conducted
involved a test of blood serum or plasma, and not whole blood. She stated that the blood
sample is placed in a centrifuge and the blood serum is separated. It is then placed in a
machine and compared to a standard set in the machine. Dr. Stern was not able to state what
scientific theory was employed to conduct the test.
           She was able to relate that based on her knowledge of the laboratory at Thomason
Hospital that their accreditation requires that they abide by strict standards. She had
personally inspected the laboratory and she felt she could trust the tests conducted in
Appellant’s case. The court overruled Appellant’s objection. Dr. Stern testified before the
jury that she had reviewed Appellant’s medical records and his statement and she found that
Appellant was extremely intoxicated. After transposition from a blood serum reading to a
whole blood reading, Appellant had a blood-alcohol reading of .20.
           David Gerard Perry, a lab technician at Thomason General Hospital, testified that he
conducted the lab tests for the hospital and that he often operated the centrifuge. He
conducted the blood-alcohol test in question. He stated that the centrifuge was used in the
process of testing for blood alcohol. Perry testified that there are measures taken in order to
ensure that the machine is working properly. If anything is not functioning properly, the
machine is designed to signal the technician of the failure through the means of alarms and
red lights. Also, every 24 hours the machine is tested for quality control purposes. Perry
stated that he utilized the standard procedures when he conducted the test.
           The witness stated that the machine involved, the LX-20 made by Beckman, was a
chemical analyzer. When asked the scientific theory upon which the machine operated, Perry
stated that he did not have such information memorized; it was provided in a booklet
concerning the operation of the machine. He could not relate what scientific theory was the
basis for the operation of the machine.
           Appellant testified in his own defense. He stated that around the time of the accident
he was estranged from his wife, depressed, and not sleeping well. He agreed that everything
in his written statement was true. He stated at trial that he believed he was very sleepy while
operating his vehicle and probably fell asleep while driving. Appellant felt that he was
capable of driving on the night of the accident.
 

II. DISCUSSION
           Appellant’s sole issue is whether the trial court erred in admitting testimony of his
blood-alcohol level when such evidence was not shown to be reliable by clear and
convincing evidence. A trial court’s ruling to admit or exclude evidence is reviewed under
an abuse of discretion standard. Montgomery v. State, 810 S.W.2d 372, 391 (Tex.Crim.App.
1991) (opin. on reh’g). Absent a clear abuse of discretion, a trial court’s decision to admit
or exclude expert testimony will not be disturbed. Wyatt v. State, 23 S.W.3d 18, 27
(Tex.Crim.App. 2000); Morales v. State, 32 S.W.3d 862, 865 (Tex.Crim.App. 2000). An
abuse of discretion exists when the trial court’s decision was so clearly wrong as to lie
outside the zone of reasonable disagreement, in other words, the trial court’s decision or
action was arbitrary, unreasonable, and made without reference to any guiding rules or
principles. See Montgomery, 810 S.W.2d at 391.
           Pursuant to Kelly v. State, 824 S.W.2d 568 (Tex.Crim.App. 1992), the proponent of
expert testimony or evidence based on a scientific theory must show by clear and convincing
evidence that the evidence is: (1) reliable and (2) relevant to assist the trier of fact in its
fact-finding duty. Id. at 572; Ochoa v. State, 994 S.W.2d 283, 284 (Tex.App.-- El Paso 1999,
no pet.). To be reliable, the proffered evidence must satisfy three criteria: (1) the underlying
scientific theory must be valid; (2) the technique applying the theory must be valid; and (3)
the technique must have been properly applied on the occasion in question. Kelly, 824
S.W.2d at 573. Appellant is not challenging the scientific validity of blood-alcohol testing
as a general proposition; rather, he complains that the scientific validity and reliability of the
specific machine, the LX-20 chemical analyzer, was not demonstrated.
           In order to introduce evidence of a scientific principle, a party need not always present
expert testimony, treatises, or other scientific material to satisfy the Kelly test. It is only at
the beginning of judicial consideration of a particular type of forensic scientific evidence that
trial courts must conduct full-blown “gatekeeping” hearings under Kelly. Hernandez v. State,
116 S.W.3d 26, 28-29 (Tex.Crim.App. 2003). Once a scientific principle is generally
accepted in the pertinent professional community and has been accepted in a sufficient
number of trial courts through adversarial Daubert/Kelly hearings, subsequent courts may
take judicial notice of the scientific validity (or invalidity) of that scientific theory based upon
the process, materials, and evidence produced in those prior hearings. Id. at 29. Trial courts
are not required to re-invent the scientific wheel in every trial. However, some trial court
must actually examine and assess the reliability of the particular scientific wheel before other
courts may follow that holding. Some court, somewhere, has to conduct an adversarial
gatekeeping hearing in order to determine the reliability of the given scientific theory and its
methodology. Id. Although appellate courts are allowed to take judicial notice of other
appellate opinions concerning a specific scientific theory or methodology in evaluating a trial
judge’s Daubert/Kelly “gatekeeping” decision, judicial notice on appeal cannot serve as the
sole source of support for a bare trial court record concerning scientific reliability. Id. at 31-32.
           In the instant case, there is a dearth of evidence presented at trial with regard to the
underlying scientific theory regarding the LX-20 chemical analyzer. While there was
reference to written materials concerning the underlying scientific theory, these materials
were not provided to the trial court and do not appear in the record. We find that the State
did not meet its burden in establishing the scientific validity and reliability of that
instrument.



           However, this does not end our inquiry. The improper admission of scientific or
expert testimony or evidence is regarded as non-constitutional error. Accordingly, the error
will be disregarded unless the reviewing court has fair assurance, after considering the record
as a whole, that the error did not effect the jury, or had but slight effect. Bagheri v. State,
119 S.W.3d 755, 762-63 (Tex.Crim.App. 2003); see Tex. R. App. P. 44.2(b). In making this
determination, the question is not simply whether there was sufficient evidence to support
the verdict. Bagheri, 119 S.W.3d at 763. Instead, the reviewing court should consider the
entire record, including testimony, physical evidence, jury instructions, the State’s theories
and any defensive theories, closing arguments, and voir dire, if applicable. Id. Important
factors include the nature of evidence supporting the verdict, the character of the alleged
error, and how it might be considered in connection with other evidence in the case. Id. We
should also consider whether the State emphasized the error, whether the erroneously
admitted evidence was cumulative, and whether it was elicited from an expert. Id.
           In the court’s charge to the jury, the jury was instructed with regard to both counts 
that they could find that Appellant was intoxicated by either not having the normal use of
mental or physical faculties by reason of the introduction of alcohol or by having an alcohol
concentration of 0.08 or more. See Tex. Penal Code Ann. § 49.01(2)(A) & (B) (Vernon
2003). These two theories of intoxication are alternate ways of proving intoxication. As
evidence of an accused’s blood-alcohol level is probative evidence regarding both the
impairment theory and the concentration of 0.08 theory, the relevant question when
determining if the improper admission of evidence of an accused’s blood-alcohol level was
harmful or harmless is not whether the other evidence was sufficient to support conviction
on the impairment theory; instead, the relevant question is whether the erroneously admitted
evidence of blood-alcohol level might have prejudiced the jury’s consideration of that other
evidence regarding impairment. Bagheri, 119 S.W.3d at 763. Therefore, while the
sufficiency of the evidence supporting the impairment theory is a factor in the harm analysis,
it is not, by itself, determinative. See id. at 763-64.
 

           We find that in the present case, upon examination of the entire record, that the error
in the admission of the blood-alcohol tests results was harmless. With regard to the evidence
adduced at trial regarding the impairment theory, Appellant admitted in his confession and
during his testimony at trial that he drank sixteen beers on the day in question and he had had
little sleep the night before. There was testimony that he was driving the wrong way on the
freeway and it would take only four or five drinks to reach a blood-alcohol level of .08. 
Police and ambulance personnel arriving at the scene testified regarding the smell of alcohol
about Appellant and the presence of beer cans. Further, there was unobjected-to testimony
that Alfredo Parra’s blood-alcohol level was .23. They both had roughly the same number
of drinks that night. The jury could certainly have determined that even absent the testimony
of Appellant’s blood-alcohol level, that his level was greater than .08; and also, that he was
physically and mentally impaired due to the introduction of alcohol.
           Further, a review of the closing arguments reveals that the prosecutor did not
accentuate the blood-alcohol evidence in proportion to the impairment evidence. 
Accordingly, we find that the blood-alcohol level evidence and testimony could not have
substantially affected the jury’s deliberations and could not have prejudiced the jury’s
consideration of the overwhelming evidence of Appellant’s intoxication and impairment. 
Appellant’s Issue No. One is overruled.
 

           Having overruled Appellant’s sole issue on review, we affirm the judgment of the trial
court.
 
                                                                  RICHARD BARAJAS, Chief Justice
June 23, 2005

Before Barajas, C.J., McClure, and Chew, JJ.

(Do Not Publish)