Opinion issued January 31, 2006










  








In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-03-01314-CR
____________
 
THERAN TREMAYNE BLACKWELL, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from the 184th District Court
Harris County, Texas
Trial Court Cause No. 932330
 

 
 
DISSENTING OPINION
          In its discussion of appellant’s first issue, the majority makes a series of 
critical mistakes that results in its erroneous conclusion that the trial court did not err
in admitting the extraneous offense testimony of K.S. and C.R., which was offered
by the State in its rebuttal case against appellant. 
          The majority misidentifies evidence that bolstered appellant’s good character
as evidence that appellant “lacked the intent to have sexual contact with [the
complainant]” because appellant “was like a regular parent who did a good job of
raising two other young boys.”


 (Emphasis added.) From this, the majority further
errs in concluding that “[t]he defensive theory that appellant lacked the intent to
commit the offense was thus introduced into the case and was subject, therefore, to
rebuttal by the State.” (Emphasis added.) The majority also erroneously concludes
that appellant “introduced the defensive theory that he was the victim of a frame-up
by Melvina Stepherson.” Having erroneously concluded that “appellant propounded
two defensive theories–that he lacked the intent to commit a sexual offense against
[the complainant], and that he was the victim of a frame-up by Melvina Stepherson,”
the majority further errs in concluding that the State’s rebuttal extraneous offenses
“are sufficiently similar to the charged offense to be probative evidence of appellant’s
intent to commit a sexual offense against [the complainant] and to refute the theory
that appellant was the victim of a frame-up by Melvina Stepherson.” (Emphasis
added.) 
          As noted by the State itself, in its briefing to this Court, “[w]hen the State
introduced evidence [that appellant] had sexually abused two other teenage boys, it
rebutted Appellant’s suggestion that he was not the sort of person that would commit
the charged offense.” Here, however, as discussed below, the State did not properly
attempt to correct any such false-impression inferences created by the testimony of
appellant’s witnesses through cross-examination of those witness. Rather, the State
improperly “rebutted appellant’s suggestion” by calling two other witnesses to correct
it with testimony about two notably dissimilar extraneous offenses, and the trial court
reversibly erred in allowing the State to do so. 
          Accordingly, I respectfully dissent.
The Issue Presented 
          In his first issue, appellant argues that the trial court erred in admitting into
evidence the State’s rebuttal testimony of K.S. and C.R. because their testimony
concerned extraneous offenses and was offered to show only that appellant was “a
sexual predator generally and that he was acting in conformity therewith during the
commission of the offenses alleged in the indictment.” 
          In its response to appellant’s first issue, the State notes that, in anticipation of
appellant’s impeachment of the complainant’s credibility, it elicited testimony from
the complainant concerning his many inconsistent statements. In fact, appellant then
did, as the State contends, cross-examine the complainant about his inconsistent
statements and later called several witnesses “who claimed that [the complainant] was
not a truthful person and had a reputation for dishonesty.” The State also notes that
appellant “repeatedly elicited testimony that he had many girlfriends throughout his
life.”
          In stark contrast to the majority’s characterization of appellant’s two defensive
theories, the State concedes that “the defense’s two primary themes” at trial consisted
of appellant’s effort to (1) “discredit [the complainant] and convince the jury he had
fabricated his claims of sexual abuse and was not to be believed,” and (2) show that
“appellant was not the kind of person who would sexually abuse young boys.” The
State asserts that “[a]t the close of appellant’s case, he had (1) secured admissions
from [the complainant] that he had told a number of people he lied about what
appellant had done to him, (2) introduced a great deal of testimony that [the
complainant] was not a truthful individual, and (3) sought to establish that he was the
sort of man that had normal dating relationships with women and who therefore
would not approach teenage boys.” The State contends that because its evidence that
appellant had sexually abused two other boys “rebutted appellant’s suggestion that
he was not the sort of person that would commit the charged offense,” the evidence
“had relevance apart from character conformity and was admissible.”
          The extraneous offense testimony of K.S. and C.R. was not admissible to
bolster the impeached testimony of the complainant. Thus, the issue squarely
presented to this Court, and actually argued by the State itself, is whether the
extraneous offense testimony of K.S. and C.R. was admissible to rebut any false
impression-inferences created by the testimony of appellant’s witnesses that 
appellant “was not the sort of person that would commit the charged offense.” 
          It must be emphasized that the State, in its briefing to this Court, does not in
any way contend that the extraneous offense testimony of K.S. and C.R. was
admissible to rebut any defensive theory that “appellant lacked the intent to commit
the offense” or that appellant was “the victim of a frame up by Melvina Stepherson.” 
In fact, the State, again in stark contrast to the majority, makes no attempt at all in its
briefing to this Court to argue that the extraneous offenses are in any way similar to
the offense charged in the instant case. 
          
Pertinent Testimony
          In the State’s case-in-chief, the complainant, a 13-year-old boy at the time of
trial, testified that he had known appellant for almost his entire life and that he and
his cousins, Glen and Fred Stepherson, would go to appellant’s house to watch
movies and to play. On several different occasions, starting when he was around
eight or nine years old, the complainant received permission from his grandmother,
Melvina Stepherson, to spend the night at appellant’s house. The complainant slept
in the same bed as appellant, and, one night, appellant woke the complainant to tell
him that the complainant had wet the bed. After the complainant went to the
bathroom to change clothing, appellant told him that he could either “get a whipping
or take [his] clothes off.” The complainant told appellant that he would rather receive
a whipping. After appellant struck him on the buttocks with a belt, the complainant,
not wanting to be struck again, took off his clothes. Appellant then told the
complainant to get some baby oil from the bathroom, and when the complainant
returned, appellant was naked and told him to “rub [appellant] down with baby oil.”
The complainant rubbed the oil on appellant’s chest, penis, and buttocks, and
appellant rubbed the complainant’s penis and buttocks with baby oil. Appellant told
the complainant not to tell anyone what had happened, and, because the complainant
was scared, he did not tell anyone what had occurred. 
          On eight or nine different occasions, appellant took the complainant for a ride
in appellant’s car and gave the complainant alcoholic beverages to drink, which made
the complainant feel dizzy and drowsy. Appellant told the complainant to remove his
clothes, and appellant then pulled down his own pants and told the complainant to rub
appellant’s penis. At the same time, appellant would rub the complainant’s penis
with one hand and would drive the car with the other hand. 
          The complainant further testified that, on at least five or six other occasions
when they were at a recording studio, appellant took him to a back room, which had
“some kind of fuzz” on the walls, and told the complainant to take off his clothes. 
Appellant removed his own clothes and instructed the complainant to rub appellant’s
penis as appellant rubbed the complainant’s penis. 
          Over appellant’s objections, the State, while still presenting its case-in-chief,
elicited testimony from the complainant that one week prior to trial, he was at the
house of Jeneko Vincent, who was the friend of Glen and Fred. While there, Vincent,
Glen, Fred, and Eldrick Telfar, another friend, forced the complainant to make a
videotape, in which he stated that the allegations that he had made against appellant
were not true and that he was “just jealous of [his] cousins Glen and Fred because
they were getting a lot of things from [appellant].” Later at Telfar’s house, they made
the complainant write a letter, in which he stated that his uncle told him to make the
allegations against appellant. The complainant explained that the four boys told him
that they would pay him money to write the letter but that he did not want their
money. The complainant stated that he made the tape and wrote the letter because the
boys told him that the allegations against appellant would be in the news and that the
complainant would not have any friends if he did not retract his allegations against
appellant. 
          Melvina Stepherson testified that she has raised the complainant since he was
11 months old because his mother was not a good mother to him. She explained that
she was acquainted with appellant because he was a cousin of two of her
granddaughters. She noted that appellant once bought tennis shoes for the
complainant but that she did not think that such a purchase was odd because appellant
“always bought things for [her] grandchildren.” She also noted that appellant would
take the complainant out to eat, to the movies, and to appellant’s house to spend the
night. Stepherson explained that, when the complainant was eight or nine years old,
he first made allegations against appellant, but that she did not do anything about it
because, at that time, she had just had a stroke and could not drive him anywhere. 
          Toward the beginning of its direct examination of Stepherson, the State, again
while presenting its case-in-chief, asked her, “Now, as long as you have known . . .
[appellant], have you ever known him to have a girlfriend?” Stepherson answered,
“No.” Under appellant’s cross-examination, she testified that appellant had coached
a football team, but that the complainant had not played on that team. She stated that
two of her grandsons, Glen and Fred, had lived with appellant for about two years and
that appellant had taken care of them. On re-direct examination, she testified that
appellant’s football league was one in which “he got young boys to come and play on
his football team.” She further testified that appellant was usually in the company of
boys and men and that appellant bought Glen and Fred expensive items. 
          In his defense, appellant called Britney Paley, one of the complainant’s
cousins. Paley testified that, in her opinion, the complainant is not a truthful person. 
She stated that, approximately one year before the trial began, the complainant told
her that the allegations he asserted against appellant were not true and that he made
them up because appellant was mean. He also told Paley that he did not like appellant
because appellant “didn’t do anything for him” and showed favoritism. She also
stated that the complainant called her one week before the trial began and again told
her that the complainant’s allegations against appellant were false. On both direct
and cross-examination, Paley also testified that she had known appellant to have had
many girlfriends. 
          Eldrick Telfar testified that the complainant voluntarily made the videotape and
wrote the letter in which the complainant admitted that his allegations against
appellant were false. On cross-examination, Telfar admitted that appellant had
previously bought him clothes and shoes and had taken him to the mall and the
recording studio.
          Glen Stepherson testified that, in his opinion, the complainant was not a
truthful person and that the complainant made the videotape and wrote the letter
voluntarily. He explained that the complainant told him that he made the videotape
and wrote the letter to help appellant because the allegations were not true. Glen also
testified that appellant had helped to raise him, that appellant had done a good job
doing so, and that appellant had had a number of girlfriends over the years. 
          Appellant also presented the testimony of Jason Thomas, Jeneko Vincent, 
Brooke Austin, and Virginia Blackwell. Thomas, a friend of Glen, testified that he
did not believe that the complainant was a truthful person and that the complainant
told Thomas that he wrote the letter because he was sorry for lying and that he wanted
appellant to be released from jail. Thomas also testified that his sister had dated
appellant for a short time and that his sister had tattooed appellant’s nickname,
“Pookie,” on her leg. Vincent testified that, in his opinion, the complainant was not
a truthful person and that the complainant told him that he made the videotape
because he made the allegations against appellant out of jealousy. Austin testified
that, two months before trial began, the complainant told her that appellant had never
touched him, that, in her opinion, the complainant was not a truthful person, and that
appellant had had many girlfriends. Blackwell, appellant’s mother, testified that
appellant had had many girlfriends over the years. 
            In its rebuttal, the State then presented the testimony of K.S., a 16-year-old boy
at the time of trial, and C.R., a 15-year-old boy at the time of trial. K.S. testified that,
when he was 13 years old, he had sung in a three-boy group and had made an
appointment to record music at appellant’s studio. K.S. and two friends went to the
studio a few times to listen to other people record music, and, on about the seventh
visit, appellant, whom K.S. knew as “Trey Black,” told K.S. that he wanted K.S. to
sing individually in a soundproof room, while the other two boys waited in a room
next door. Appellant told K.S. that K.S. was not singing loudly enough and that if
K.S. “jacked off or bust[ed] a nut, it would make [him] sing louder.” Appellant told
him to remove his clothes, and K.S. eventually complied because he thought that
appellant would not allow him to leave unless he did so. Appellant then rubbed
K.S.’s stomach and told him to masturbate, but K.S. refused. After a while, appellant
let K.S. put his clothes back on and leave. When K.S. got home, he told his mother
what appellant had done, and his mother reported the incident to the police
department. 
          C.R. testified that he knew the complainant because they used to live on the
same street. On one occasion, when C.R. was 12 years old, appellant, whom C.R.
knew as “Pookie Trey,” drove both the complainant and C.R. to the movies. 
Afterward, on the way back to their homes, appellant claimed that he was sick and
stopped at his apartment. Because the complainant appeared to be asleep in the back
seat, appellant told C.R. to go inside the apartment with him. Appellant went
upstairs, while C.R. played a video game downstairs. Later, appellant called C.R.
upstairs and told him that C.R. “needed to become a man.” They entered appellant’s
bedroom, where a inflatable sex doll was lying on the floor. Appellant told C.R. that
C.R. could not leave until he “fuck[ed] the doll.” Appellant told C.R. to take off his
clothes and have sex with the doll until C.R. “nutted.” Appellant videotaped C.R.
having sex with the doll, and when C.R. was finished, appellant told C.R. that C.R.
“was a man now.” 
Extraneous Offense Evidence 
          A trial court’s admission of extraneous offense evidence is reviewed for an
abuse of discretion. Rankin v. State, 974 S.W.2d 707, 718 (Tex. Crim. App. 1996);
Wolfberg v. State, 73 S.W.3d 441, 443 (Tex. App.—Houston [1st Dist.] 2002, pet.
ref’d). As long as a trial court’s decision to admit evidence is within the “zone of
reasonable disagreement,” there can be no abuse of discretion. Montgomery v. State,
810 S.W.2d 372, 391 (Tex. Crim. App. 1990).
          Texas Rule of Evidence 404(b) embodies the well-established principle that an
accused may be tried only for the offense for which he is charged and not for 
criminal propensities. Tex. R. Evid. 404(b); Owens v. State, 827 S.W.2d 911, 914
(Tex. Crim. App. 1992). Consequently, extraneous offenses are not admissible at the
guilt phase of a trial to prove that a defendant acted in conformity with his character
in committing an offense. Tex. R. Evid. 404(b). An extraneous offense, however, has
noncharacter-conformity relevance when it has any tendency to make the existence
of a fact that is of consequence to the determination of the action more or less
probable than it would be without the evidence. Powell v. State, 63 S.W.3d 435, 438
(Tex. Crim. App. 2001). In other words, extraneous offense evidence that tends to
make an elemental or evidentiary fact more or less probable or tends to rebut some
defensive theory is relevant beyond its tendency to prove a person’s character or that
he acted in conformity therewith. Rankin, 974 S.W.2d at 718; Montgomery, 810
S.W.2d at 386–87. Consequently, evidence of other crimes or extraneous misconduct
may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge,
or absence of mistake or accident. Tex. R. Evid. 404(b). These exceptions and
others drawn from case law are neither exclusive nor exhaustive. Pondexter v. State,
942 S.W.2d 577, 583–84 (Tex. Crim. App. 1996). Such extraneous offense evidence
may be relevant and admissible to rebut a defensive theory. Ransom v. State, 920
S.W.2d 288, 301 (Tex. Crim. App. 1994); Powell, 63 S.W.3d at 439; Roberts v. State,
29 S.W.3d 596, 601 (Tex. App.—Houston [1st Dist.] 2000, pet. ref’d). 
          However, contrary to the majority’s analysis and conclusions, the State does
not contend that the rebuttal testimony of K.S. and C.R. was admissible to prove
motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or
accident. Rather, the State argues that the testimony of K.S. and C.R. “had relevance
apart from character conformity and was admissible” because “[w]hen the State
introduced evidence [that appellant] had sexually abused two other teenage boys, it
rebutted [his] suggestion that he was not the type of person that would commit the
charged offense.” The State notes that many of appellant’s witnesses testified that
appellant had had many girlfriends over the years. It asserts that “[t]he point of
introducing claims that appellant had had many girlfriends over the course of his life
was to suggest to the jury that he was not the sort of person to be sexually interested
in young boys.” The trial court explained its reasoning for admitting the rebuttal
testimony as follows: 
I think—and for the Appellate Court, generally it would be my view that
this sort of thing should not come in; but it just seems to me that the
impression in front of the jury is just so unfair if I don’t allow the State
to rebut it. So, it’s just—I guess it gets down to a basic sense of fair
play, and these rules are intended to give everybody a fair trial; the State
as well as the Defense. So, I’m clearly not setting any precedent here
because this is a very unique set of circumstances; but I am going to
allow the State to go into it.
 
          In regard to the rebuttal of such “false impressions,” the Texas Court of
Criminal Appeals has explained that, when a witness presents a picture that an
accused is not the type of person to commit a certain type of offense, the State “may
impeach that witness’s testimony by cross-examining the witness concerning similar
extraneous offenses.” Wheeler v. State, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002). 
However, as emphasized by the Court, “[t]he evidentiary caveat . . . is that the
opponent must correct the ‘false impression’ through cross-examination of the
witness who left the false impression, not by calling other witnesses to correct that
false impression.” Id. Moreover, “[a]s a general rule, the defensive theory that the
State wishes to rebut through the use of extraneous offense evidence must be elicited
on direct examination by the defense and may not by elicited by ‘prompting or
maneuvering’ by the State.” Id.; see also Shipman v. State, 604 S.W.2d 182, 185
(Tex. Crim. App. 1980).
          In the instant case, it was the State, not appellant, that placed appellant’s sexual
interest in women at issue. Although the State asserts that appellant introduced
evidence that he had had many girlfriends to suggest that “he was not the sort of
person to be sexually interested young boys,” the State, in its case-in-chief, asked
Melvina Stepherson, “Now, as long as you have known . . . [appellant], have you ever
known him to have a girlfriend?” Stepherson answered, “No.” It is well-settled that
the State “may not rely on its own questioning” to get into collateral matters and
extraneous offenses and bad acts “which would otherwise be inadmissible.” 
Shipman, 604 S.W.2d at 185. Although many of appellant’s witnesses did testify that
he had had many girlfriends over the years, it was the State that prompted the issue
by eliciting Stepherson’s contrary observation in its case-in-chief, apparently to
suggest to the jury that appellant was not the sort of person to be sexually interested
in women. 
          Even assuming that appellant, by eliciting testimony that he in fact had had
girlfriends in the past, somehow raised the defensive theory that he was not the type
of person to sexually abuse young boys, the State would only have been “entitled to
rebut that ‘false impression’ inference with cross-examination questions [of
appellant’s witnesses] concerning allegations of similar misconduct toward another
child.” Wheeler, 67 S.W.3d at 885–86. Here, however, the State did not attempt to
correct any false impression by cross-examination of the witnesses who left the false
impression. Rather, the State attempted to correct the false impression through the
direct testimony of two other witnesses, K.S. and C.R., in its rebuttal case. 
          Moreover, K.S.’s allegation that appellant rubbed K.S.’s stomach and told him
to masturbate and C.R.’s allegation that appellant insisted that he have sex with a doll
are not allegations of misconduct similar to the complainant’s allegations in the
instant case, i.e., that of mutual masturbation. 
          In sum, the State relied on its own questioning of Melvina Stepherson to get
into the extraneous offense testimony of K.S. and C.R. Moreover, regardless of
which side actually placed appellant’s sexual interest in women at issue, the State
would only have been entitled to rebut any false impression inferences through cross-examination of the pertinent witness about allegations of similar misconduct toward
other children. Here, the State presented testimony from other witnesses about
allegations that were not similar to the complainant’s allegations. Accordingly, this
Court should hold that the trial court erred in admitting the extraneous offense
testimony of K.S. and C.R. Harm Analysis
          A trial court’s error in admitting evidence is generally non-constitutional error.
Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997). Accordingly, it must be determined
whether the error affected appellant’s substantial rights and, if not, the error must be
disregarded. Tex. R. App. P. 44.2(b). A substantial right is affected where the error
had a substantial injurious effect or influence in determining the jury’s verdict. King,
953 S.W.2d at 271. A conviction due to non-constitutional error will not be
overturned on appeal if, after examining the entire record, the appellate court has fair
assurance that the error did not influence the jury, or its effect was slight. Reese v.
State, 33 S.W.3d 238, 243 (Tex. Crim. App. 2000). In conducting its analysis, an
appellate court considers the nature of the evidence that supports the verdict, the
character of the alleged error, and how the jury might consider it in connection with
other evidence. Bagheri v. State, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003). 
Additional considerations include jury instructions, the State’s theory of the case, the
defense’s theory of the case, closing arguments, voir dire, and whether the State
emphasized the error. Motilla v. State, 78 S.W.3d 352, 355–56 (Tex. Crim. App.
2002). Finally, the presence of overwhelming evidence of guilt may also be
considered. Id. at 357.
          The State’s rebuttal testimony of K.S. and C.R. undoubtedly had more than a
slight effect upon the jury’s decision. In all, 16 witnesses testified over a four-day
period in the guilt phase of the trial. Seven of those testified for the State in either its
case-in-chief or rebuttal, and nine of those testified for appellant. Because there was
no physical or otherwise corroborative evidence, the outcome of the trial depended
solely upon whether the jury believed the complainant. A large portion of the closing
arguments, both appellant’s and the State’s, was spent on discussing the credibility
of the witnesses. In fact, although the trial court instructed the jury that it could only
consider the testimony of K.S. and C.R. “in determining the motive, opportunity,
intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the
defendant,” the State expressly argued that their testimony was presented “for the
purpose of rebutting” the evidence presented by appellant that he was “a good guy”
and that the complainant was “a liar.” 
          After reviewing the entire record, it cannot be said that the impact of the
testimony of K.S. and C.R. did not significantly impact the jury’s verdict because it
was presented to improperly bolster the State’s case. See Webb v. State, 36 S.W.3d
164, 183 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (en banc) (holding that
erroneous admission of extraneous sexual assault of third party was harmful where
complainant and appellant were only witnesses to offense). Moreover, it cannot be
said with fair assurance that the erroneous admission of the testimony of K.S. and
C.R. did not influence the jury or that its admission did not affect appellant’s
substantial rights. Accordingly, this Court should hold that the erroneous admission
of the extraneous offense testimony of K.S. and C.R. resulted in reversible error. 
 
 
 
 
Conclusion
          Because the trial court reversibly erred in admitting the extraneous offense
testimony of K.S. and C.R. into evidence, this Court should sustain appellant’s first
issue, reverse the judgment of the trial court, and remand this cause to the trial court
for a new trial.
 
 
                                                                        Terry Jennings
                                                                        Justice
 
Panel consists of Justices Nuchia, Jennings, and Alcala.
 
Justice Jennings, dissenting.
 
Publish. Tex. R. App. P. 47.2(b).