

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00410-CR

| | | |
|---|---|---|
| Adam Terrell Rhyne | § | From County Court |
| | § | of Clay County (13538) |
| v. | § | November 21, 2012 |
| | § | Opinion by Justice Gabriel |
| The State of Texas | § | (p) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was error in the trial court's judgment. It is ordered that the judgment of the trial court is reversed and this case is remanded for a new trial.

SECOND DISTRICT COURT OF APPEALS


By_____
Justice Lee Gabriel



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00410-CR

ADAM TERRELL RHYNE                                                    APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

----------

### FROM COUNTY COURT OF CLAY COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

Appellant Adam Terrell Rhyne appeals, seeking a reversal and remand for a new trial after a jury found him guilty of driving while intoxicated (DWI). In two points, he claims that (1) the trial court abused its discretion by admitting breath-test results, and (2) the State failed to prove venue. We sustain his first point and reverse.

----

[1]*See* Tex. R. App. P. 47.4.

## Background Facts and Procedural History

Texas Department of Public Safety (DPS) Trooper Zachary Ward was the only witness called to testify at Appellant's trial. He stopped Appellant's pickup truck around five minutes before one o'clock on a weekend morning after observing it drift across the white line that separates the shoulder from the roadway and then back across the center line of southbound U.S. Highway 287 near the "Gainesville overpass." Trooper Ward conceded that Appellant was not speeding or committing any traffic offenses other than failing to stay in his lane.

Appellant pulled over without incident. Trooper Ward approached him, asked him for his driver's license and insurance, and also asked if he had been drinking. Appellant admitted that he had.

Trooper Ward ordered him out of his truck, administered field sobriety tests, and formed the opinion that Appellant was "intoxicated by alcohol." He arrested Appellant for DWI, and took him to the Clay County Sheriff's Office, which was "a minute or two" away.

The trooper's patrol car was equipped with a dash-cam video recorder that recorded the stop, but the recording was lost by the time Appellant's case went to trial. On the stand, Trooper Ward could not recall whether Appellant's eyes had been bloodshot or his speech slurred, and Trooper Ward admitted that the offense report indicated neither of these facts nor that Appellant had fumbled for his license or insurance. Trooper Ward also admitted that the report did not mention that Appellant smelled of alcohol, but the trooper explained that he had a

3

cold on the night he arrested Appellant that had interfered with his sense of smell.

Appellant agreed to take a breath test at the jail. Trooper Ward administered the test on an Intoxilyzer 5000, and Appellant provided two breath samples that yielded results of 0.148 and 0.141, respectively.

When the State offered these results at trial, Appellant objected that the State had not laid the proper predicate because it had offered no testimony that the intoxilyzer had been properly operating on the day of Appellant's breath test. The trial court replied, "I'm going to overrule your objection. I realize where you are coming from. The intoxilyzers have been around long enough that I feel like that the State has proved their reliability."

Trooper Ward then testified that the intoxilyzer was working properly on that day because otherwise it would have "kicked out a negative results [sic]." He further testified that the intoxilyzer is maintained periodically by a technical supervisor who inspects it and makes sure it is working properly.

Trooper Ward continued to refer to the technical supervisor as Appellant questioned him on voir dire:

BY [Counsel for Appellant]:

Q. Trooper Ward, can you give us a scientific basis for the operation of the Intoxilyzer 5000?

A. No. You would have to subpoena a technical supervisor to do that.

4

Q. And as far as — you just answered a question that you believe this is checked and maintained by a technical supervisor. Do you have the records of this instrument with you?

A. No, I do not.

Q. Do you know if it was tested to determine whether the — the known sample was correct or not?

A. If it wasn't, the technical supervisor would have previously taken it out of service and replaced it with another intoxilyzer.

Q. Yeah. If that had happened. But you don't have the records of this, right?

A. No, I do not.

Q. Okay. So you don't know if that next test — if there was another test of that intoxilyzer machine showed it to be out of — out of tolerance, do you?

A. No, I do not.

Q. Okay. And as far as the pressure switch on there, do you know if the pressure switch was working properly so that the tone sounded when enough pressure was going through there?

A. The tone sounded so it must have been.

Q. What if the pressure switch wasn't operating correctly and still sounded a tone, do you know if that can happen?

A. You would have to take that up with the technical supervisor. I do not know the internal workings. I've only been certified to operate it.

Q. Right. Right. And so your — the limits of your ability are to go into the machine, turn it on, and march it through the steps that you have been trained to do?

A. Yes.

5

Q. But as far as how that works or the reliability of that specific machine on the date of November 25th, 2007, the only thing you can say is that that printed out a result that day?

A. That is correct.

Q. But whether it was actually working correctly or not as tested by the technical supervisor as you say on a routine basis, you don't know that?

A. It would have not printed out a result if it hadn't been operating correctly? [sic]

Q. How do you know that?

A. 'Cause they never have in the past.

Q. Well, you're saying that it can't print out and be wrong?

A. You would have to take that up with a technical supervisor.

Q. So you don't know if it could print out and be wrong, right?

A. I have been instructed in class that it will not.

Q. But you don't know that it will or will not so if you get a slip out you're going to take that as being true and you don't really know whether it is or not because that's what the technical supervisor's job is, right?

A. The technical supervisor advised us that —

Q. No. I didn't ask you —

A. — if it prints out a result —

Q. I'm not asking what you were told. I am asking what you can testify to as you sit here today.

A. That's what I know. A technical supervisor told me if it printed that out it worked correctly.

Q. Okay. But if a technical supervisor comes and five days later finds out that that sample, reference sample, is out of tolerance but yet prints out right they'd have to go back and invalidate all those test[s], right?

A. I don't know.

Q. Okay. Again, I think I've asked you this. On November 25th, at 1:26 a.m. of 2007, you don't know whether — you can't sit here and say of your own knowledge that that Intoxilyzer 5000 was working correctly that morning?

A. It printed out a test sample and it would have given an invalid test if it hadn't been working correctly.

Q. And that's because —

A. That's — it's been designed to do that.

Q. And that's really outside of your —

A. I cannot give you the —

Q. — training?

A. — I cannot give you the internal workings of it, no.

Q. Okay. And so if the pressure switch wasn't working and so they weren't getting deep alveolar air from the lungs of the person in order to test, you don't know that?

A. It would have kicked out an invalid test.

Q. Unless the pressure switch was not working right, correct?

A. I don't believe the pressure switch would have allowed it to do that.

Q. What do you mean you don't believe that? Do you know that?

A. Yeah, I've been told if it prints out a test record then the machine is operating correctly.

7

Q. Okay. Same thing. So if I ask you, what if the reference sample is out of tolerance but it prints out close enough but really the true value was different but your answer is going to be if the test record prints out it's operating properly?

A. If the reference sample is out of tolerance there is a reference sample in there and we have been trained to replace the reference sample and change it out.

Q. Yeah. But I am saying if it's supposed to be a certain value but the machine reads it at a value that's different than what the real value of it is wrong, you're going to say, well, if it prints out, it prints out?

A. It wouldn't print out.

Q. Oh, it wouldn't?

A. The instrument would recognize that the reference sample was out of tolerance and would not — it would kick out an invalid test and I'd have to —

Q. What if —

A. — to request a blood sample.

Q. What if the light source — 'cause you're familiar with infrared spectroscopy, right?

A. Sure.

Q. And you know how that works in the machine?

A. Vaguely.

Q. Okay.

A. They gave us a little spin down of it.

Q. Okay. So if the light source is weak and doesn't produce as much light as it should and so reads it incorrectly about how

8

much light is being absorbed by the alcohol molecules in there and prints it out wrong, it's going to be right because it prints out, right?

A. Could you restate the question?

Q. Can the light source —

A. You lost me there.

Q. Can the light source be weak and not produce the amount of light that should be in there and the amount that should be absorbed — 'cause you know that's how they measure it are the molecules of alcohol that absorb light from one side to the other, right?

A. That's correct.

Q. All right. So if the light source that comes out of there is weaker and not as much as absorbs as it should be but it still prints out, it's still right; is that right?

A. I couldn't say. You'd have to talk to a technical supervisor about that.

Q. But as far as you know if it prints out it's right; that's your answer?

A. That is what I have been told.

Appellant re-urged his objection that the proper predicate had not been laid, the objection was overruled, and the breath-test results were admitted and published to the jury.

After the parties had rested and as the trial court recessed the jury to prepare the charge, one juror asked if the jury would be allowed to look at the evidence of Appellant's breath-test results, which had been admitted as State's Exhibit Number One.

9

JUROR:  Excuse me, Judge?

THE COURT:  Yes?

JUROR:  Are we allowed to look at that Exhibit No. 1?

THE COURT:  Not until you go to the deliberation room.  It has been passed to you once already.

JUROR:  Right.

THE COURT:  But you can request it at that time.

JUROR:  Okay.

During closing arguments, the prosecutor noted that Appellant was arrested after he had drifted out of his lane and failed the field sobriety tests.

But the prosecutor stressed the evidence of the breath-test results.  He observed that it showed Appellant's alcohol concentration was almost twice the legal limit, and he argued that it substantiated the facts obtained at the scene. Further, he conceded that it was the "best evidence" of whether Appellant was intoxicated:

> And you've got a test that's 40–something minutes, 45 minutes, after the time of driving and that test is .14. That is the best evidence we have of what — of whether or not this Defendant was intoxicated.

The prosecutor also argued that the intoxilyzer was working properly because Trooper Ward said it was and that Appellant, himself, could have subpoenaed a technical supervisor:

> That — the machine was working properly.  You heard Trooper Ward testify that it was working properly.  The Defense has the exact same subpoena power that I have.  They could have subpoenaed the technical breath test operator [sic] also.  But it's

10

easier to tell what the State didn't do than what actually did happen. I mean, that's a .14.

The jury found Appellant guilty and the trial court sentenced him to six months in jail, probated for six months, and a $2000 fine.

## Venue

In his second point, Appellant raises for the first time the issue whether the State proved venue, that is, whether the events forming the basis of Appellant's conviction occurred in Clay County.

Unless an appellant timely disputed venue in the trial court, or unless the record affirmatively shows the contrary, the rules require that we presume that venue was proven in the county as alleged in the charging instrument. *See* Tex. R. App. P. 44.2(c); *Holdridge v. State*, 707 S.W.2d 18, 20–21 (Tex. Crim. App. 1986). Appellant did not challenge the State's proof of venue in the trial court. He did not object to the information's allegation that the offense occurred in Clay County, he did not cross-examine the State's witness on the issue, he did not present evidence showing that the events for which he was prosecuted occurred in some county other than Clay County (and we have found none), he did not move for a directed verdict on the ground (or any other ground) that the State failed to prove venue, he did not object to the jury charge, he did not argue to the jury that the State had not proven venue, and he did not move for a new trial. Accordingly, we hold that Appellant failed to raise the issue of venue and that the

11

presumption that venue was proved in the trial court stands. *See Holdridge*, 707 S.W.2d at 22. We overrule Appellant's second point.

## Breath-Test Predicate

In his first point, Appellant contends that the trial court abused its discretion by admitting the results of his breath test over his objection that the State failed to lay the proper predicate. More specifically, he complains that the State failed to establish that (1) the intoxilyzer machine was functioning properly on the day of Appellant's test; (2) the intoxilyzer was periodically supervised by one understanding the scientific theory behind it; and (3) the results were interpreted by a witness qualified to do so. *See Harrell v. State*, 725 S.W.2d 208, 209 (Tex. Crim. App.1986). We agree.

In *Harrell*, the court of criminal appeals established the predicate for intoxilyzer-test results, holding that if the State seeks to introduce the results in evidence the State must establish: (1) that the machine functioned properly on the day of the test as evidenced by a reference sample having been run through it; (2) the existence of periodic supervision over the machine and operation by one who understands the scientific theory behind it; and (3) proof of the results of the test by a witness or witnesses qualified to translate and interpret such results. *See id.*, at 209–10; *Kercho v. State*, 948 S.W.2d 34, 37 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd).

Professors Dix and Schmolesky have observed that the predicate for breath-test results is typically met by testimony of two witnesses. 40 George E.

Dix & John M. Schmolesky, *Tex. Practice: Criminal Practice & Procedure*, § 14:84 (3d ed. 2011); *see Reynolds v. State*, 204 S.W.3d 386, 387 (Tex. Crim. App. 2006); *Kercho*, 948 S.W.2d at 37; *Guardiola v. State*, No. 03-08-00399-CR, 2010 WL 1170204, at *3–4 (Tex. App.—Austin Mar. 23, 2010, no pet.) (mem. op., not designated for publication); *Smith v. State*, No. 05-96-01724-CR, 1998 WL 908905, at *1 (Tex. App.—Dallas Dec. 31, 1998, pet. ref'd) (not designated for publication).  The certification framework established by DPS distinguishes between persons who are certified to administer breath tests—operators of breath testing devices—and those certified to function in a supervisory capacity—technical supervisors.  *See French v. State*, 484 S.W.2d 716, 719 (Tex. Crim. App. 1972) ("[A]n officer may administer a breath test even though he is not otherwise qualified to interpret the results, and the standards required to qualify one to administer the test are far less than those qualifying to interpret the result[.]"); 37 Tex. Admin. Code §§ 19.5 (operator certification), 19.6; (technical-supervisor certification) (West Mar. 26, 2006).  Certification in the latter capacity requires "knowledge and understanding of the scientific theory and principles as to the operation of the instrument and reference sample device."  *Id.*, § 19.6(b)(4).  "Thus," Professors Dix and Schmolesky have noted, "a person certified as a technical supervisor is generally required to meet the second and third requirements of the *Harrell* predicate."  Dix & Schmolesky, § 14:84.  In other words, the technical supervisor is usually the one who testifies that he or she understands the scientific theory behind the intoxilyzer; periodically supervises

13

the intoxilyzer program in the locale where the defendant took the test; has the qualifications necessary to interpret the results; and actually does so at trial. *See Harrell*, 725 S.W.2d at 209–10.

With these principles in mind, Professors Dix and Schmolesky have outlined the typical manner in which breath-test evidence is presented at trial:

> First, the officer who administers the test testifies that he is certified as an intoxilyzer operator, that he administered the test to the defendant and did so in accordance with the Department's regulations, and that the results are contained in a data readout that the State offers as an exhibit. As part of this testimony, the operator testifies that he ran a reference test on the intoxilyzer and what results were produced by this reference test.

> Second, an officer who was the technical supervisor with supervisory responsibility for the machine used in the test testifies that he is certified by the Department as a technical supervisor, the machine used was certified by the Department for testing purposes, the machine used was checked periodically to assure that it operated properly, and that the reference sample used by the officer administering the test was properly prepared. This witness generally asserts that he understands the scientific theory of the device and interprets the numbers on the data readout. He may also explain the reference test and what is meant by the results of this process.

Dix & Schmolesky, § 14:84.

Here, Appellant's argument is that the trial court erred by admitting the results of his breath test because no one testified that the machine used was certified by DPS for testing purposes and was checked periodically to assure that it operated properly or that the reference sample used by the officer administering the test was properly prepared. Further, no one asserted any understanding of the scientific theory of the device, and no one interpreted the

14

numbers on the data readout. In fact, whenever Appellant asked any questions touching on the scientific theory of the intoxilyzer, Trooper Ward referred him to the technical supervisor.

The State responds that in order to satisfy the predicate for intoxilyzer results, it only had to satisfy the three-part *Kelly* test for reliability of scientific evidence. In other words, the State argues that it had to prove by clear and convincing evidence only that (1) the underlying theory is valid; (2) the technique applying the theory is valid; and (3) the technique was properly applied in this case. *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992); *see also Hartman v. State*, 946 S.W.2d 60, 63 (Tex. Crim. App. 1997) (holding that *Kelly* applies to all scientific evidence). Further, the State asserts, it needed only to have proven the third of the *Kelly* criteria because, as the court of criminal appeals observed in *Reynolds*, the legislature has already determined that the underlying science behind intoxilyzer testing is valid and that the technique applying it is valid as long as the test is administered by individuals certified by and using methods approved by DPS rules. *See Reynolds*, 204 S.W.3d at 390. Thus, the State argues, in order for the trial court to have properly served its "gate-keeper" function, it need only have determined that the intoxilyzer technique was properly applied in this case.

The State points to Trooper Ward's testimony that he was certified to administer the intoxilyzer test, he waited the requisite fifteen-minute period, and he administered two tests as required by law.

15

We do not read Appellant's claim to contest these aspects of Trooper Ward's testimony. He does not appear to challenge the evidence that Trooper Ward was qualified to administer the test. Rather, the rubbing point in this case is whether the intoxilyzer was maintained by someone with an understanding of the scientific theory behind it and, more importantly, whether the intoxilyzer was operating properly on the day that Appellant submitted to testing.

On this latter point, the State offers up Trooper Ward's testimony that he knew the machine was operating properly because otherwise "it would have kicked out a negative results [sic] saying it was not working properly." This begs the question—as Appellant's counsel put to the trooper at numerous points on voir dire—what if the machine was not working properly but still printed a result that was plausible but inaccurate? Trooper Ward's response to questions along these lines varied from denying the premise to suggesting that counsel subpoena the technical supervisor. It started with the first question:

> Q. Trooper Ward, can you give us a scientific basis for the operation of the Intoxilyzer 5000?
>
> A. No. You would have to subpoena a technical supervisor for that.

And it continued:

> Q. Do you know if it was tested to determine whether the — the known sample was correct or not?
>
> A. If it wasn't, the technical supervisor would have previously taken it out of service and replaced it with another intoxilyzer.
>
> . . . . .

16

Q. What if the pressure switch wasn't operating correctly and still sounded a tone, do you know if that can happen?

A. You would have to take that up with the technical supervisor. . . . I've only been certified to operate it.

. . . . .

Q. But whether it was actually working correctly or not as tested by the technical supervisor as you say on a routine basis, you don't know that?

A. It would have not have printed out a result if it hadn't been operating correctly[.]

Q. How do you know that?

A. 'Cause they never have in the past.

Q. Well, you're saying that it can't print out and be wrong?

A. You would have to take that up with a technical supervisor.

. . . . .

Q. All right. So if the light source that comes out of there is weaker and not as much as absorbs as it should be but it still prints out, it's still right; is that right?

A. I couldn't say. You'd have to talk to a technical supervisor about that?

Q. But as far as you know if it prints out it's right; that's your answer?

A. That is what I have been told.

We review the trial court's decision to admit scientific evidence for an abuse of discretion, which means that we will not disturb it if the ruling was within

17

the zone of reasonable disagreement.  *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008).

We are not persuaded by the State's assertion that Trooper Ward's testimony was sufficient because "[e]vidence of one who holds a DPS' certification is sufficient to meet the *Kelly* criteria."  The State cites *Reynolds* for this assertion, but omits an important qualifier from that opinion:  the complete sentence from *Reynolds* is, "The fact of certification is sufficient to meet the *Kelly* criteria *with respect to the competence of the breath test operator.*"  204 S.W.3d at 390 (emphasis added).  As we have indicated, Appellant does not challenge Trooper Ward's competence as an operator.

Moreover, the issue and the critical facts in *Reynolds* differ from those presented in this case.  There, the issue was whether the operator of the breath-testing apparatus was required to understand the scientific and technological principles behind the device.  *Id.* at 387.  The court of criminal appeals held that the operator need not demonstrate such understanding.  *Id.* at 391.  And, importantly for our purposes, in *Reynolds* the State was able to produce another witness, a certified technical supervisor who was responsible for overseeing the particular intoxilyzer the trooper in that case operated.  *Id.* at 387.  The technical supervisor testified that she was familiar with the science and technology upon which the device was based and that she had first-hand knowledge that it was maintained and in good working order on the date the trooper used it to test the appellant.  *Id.*  Similar testimony is what the State failed to produce here.

18

While we defer to the trial court's implied determination that Trooper Ward was credible, we hold that it was outside the zone of reasonable disagreement for the trial court to have concluded from the trooper's testimony, credible though it may have been, that the State had shown by clear and convincing evidence that the intoxilyzer had been properly maintained by someone who understood the science behind it and that it was operating properly on the day of Appellant's breath test. Accordingly, we hold that the trial court abused its discretion by admitting the breath-test results in evidence. *See Harrell*, 725 S.W.2d at 209.

Having held that the trial court abused its discretion, we must determine whether the error affected Appellant's substantial rights. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000) (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)).

Upon review of the entire record, we are left with no fair assurance that the trial court's error did not affect the jury's deliberations or had but a slight effect. *See Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003). The jury was instructed that it could find that Appellant had been intoxicated if it found that he had lost normal use of mental or physical faculties by reason of the introduction of alcohol into the body, or if he had an alcohol concentration of 0.08 or more. The record shows that Trooper Ward pulled Appellant over late one night after observing his car weave twice from its lane. Appellant pulled over

19

appropriately and without incident. Trooper Ward determined after administering field sobriety tests that Appellant was intoxicated. The breath test subsequently administered at the jail showed that Appellant's breath alcohol concentration was nearly twice the legal limit, a fact that the State emphasized during closing argument. In fact, the State advised the jury that the breath-test evidence was the "best evidence" that Appellant was intoxicated, conceding that evidence that Appellant had lost normal use was weaker. Even before deliberations, one juror asked whether the jury would be allowed to see the exhibit showing the breath-test results. Given the record before us, we cannot say that the trial court's erroneous admission of the breath-test results did not affect the jury's deliberations or had but a slight affect. *See Bagheri*, 119 S.W.3d 755. Accordingly, we sustain Appellant's first point.

**Conclusion**

Because we hold that no reasonable view of the record supports the trial court's conclusion that the intoxilyzer had been properly maintained and was properly operating when Appellant gave a breath sample, and because the record gives us no fair assurance that the error did not affect the jury's deliberations or had but a slight effect, we sustain Appellant's first point, reverse the judgment, and remand for a new trial.

LEE GABRIEL
JUSTICE

PANEL:  DAUPHINOT, WALKER, and GABRIEL, JJ.

PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  November 21, 2012

21