02-11-410-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-11-00410-CR

 

 









 
 
 Adam
 Terrell Rhyne
  
  
  
 v.
  
  
  
 The
 State of Texas
 
 
 §
  
 §
  
 §
  
 §
  
 §
 
 
 From County Court
  
 of
 Clay County (13538)
  
 November
 21, 2012
  
 Opinion
 by Justice Gabriel
  
 (p)
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is reversed and this case is remanded for a new trial.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

    Justice Lee Gabriel

 

 

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-11-00410-CR


 
 
 Adam Terrell Rhyne
 
 
  
 
 
 APPELLANT
 
 
 
 
 V.
  
 
 
 
 
 The
 State of Texas
 
 
  
 
 
 STATE
 
 


----------

FROM County
Court OF Clay COUNTY

----------

MEMORANDUM
OPINION[1]

----------

Introduction

Appellant
Adam Terrell Rhyne appeals, seeking a reversal and remand for a new trial after
a jury found him guilty of driving while intoxicated (DWI).  In two points, he
claims that (1) the trial court abused its discretion by admitting breath-test
results, and (2) the State failed to prove venue.  We sustain his first point
and reverse.

Background
Facts and Procedural History

Texas
Department of Public Safety (DPS) Trooper Zachary Ward was the only witness called
to testify at Appellant’s trial.  He stopped Appellant’s pickup truck around five
minutes before one o’clock on a weekend morning after observing it drift across
the white line that separates the shoulder from the roadway and then back
across the center line of southbound U.S. Highway 287 near the “Gainesville
overpass.”  Trooper Ward conceded that Appellant was not speeding or committing
any traffic offenses other than failing to stay in his lane.

Appellant
pulled over without incident.  Trooper Ward approached him, asked him for his
driver’s license and insurance, and also asked if he had been drinking. 
Appellant admitted that he had.

Trooper
Ward ordered him out of his truck, administered field sobriety tests, and formed
the opinion that Appellant was “intoxicated by alcohol.”  He arrested Appellant
for DWI, and took him to the Clay County Sheriff’s Office, which was “a minute
or two” away.

The
trooper’s patrol car was equipped with a dash-cam video recorder that recorded
the stop, but the recording was lost by the time Appellant’s case went to
trial.  On the stand, Trooper Ward could not recall whether Appellant’s eyes
had been bloodshot or his speech slurred, and Trooper Ward admitted that the
offense report indicated neither of these facts nor that Appellant had fumbled
for his license or insurance.  Trooper Ward also admitted that the report did
not mention that Appellant smelled of alcohol, but the trooper explained that
he had a cold on the night he arrested Appellant that had interfered with his
sense of smell.

Appellant
agreed to take a breath test at the jail.  Trooper Ward administered the test
on an Intoxilyzer 5000, and Appellant provided two breath samples that yielded results
of 0.148 and 0.141, respectively.

When
the State offered these results at trial, Appellant objected that the State had
not laid the proper predicate because it had offered no testimony that the intoxilyzer
had been properly operating on the day of Appellant’s breath test.  The trial
court replied, “I’m going to overrule your objection.  I realize where you are
coming from.  The intoxilyzers have been around long enough that I feel like
that the State has proved their reliability.”

Trooper
Ward then testified that the intoxilyzer was working properly on that day because
otherwise it would have “kicked out a negative results [sic].”  He further
testified that the intoxilyzer is maintained periodically by a technical
supervisor who inspects it and makes sure it is working properly.

Trooper
Ward continued to refer to the technical supervisor as Appellant questioned him
on voir dire:

          BY
[Counsel for Appellant]:

          Q.  Trooper
Ward, can you give us a scientific basis for the operation of the Intoxilyzer
5000?

 

          A.  No. 
You would have to subpoena a technical supervisor to do that.

 

          Q.  And as
far as –– you just answered a question that you believe this is checked and
maintained by a technical supervisor.  Do you have the records of this
instrument with you?

 

          A.  No, I
do not.

 

          Q.  Do you
know if it was tested to determine whether the –– the known sample was correct
or not?

 

          A.  If it
wasn’t, the technical supervisor would have previously taken it out of service
and replaced it with another intoxilyzer.

 

          Q.  Yeah.
If that had happened.  But you don’t have the records of this, right?

 

          A.  No, I
do not.

 

          Q.  Okay. 
So you don’t know if that next test –– if there was another test of that
intoxilyzer machine showed it to be out of –– out of tolerance, do you?

 

          A.  No, I
do not.

 

          Q.  Okay. 
And as far as the pressure switch on there, do you know if the pressure switch
was working properly so that the tone sounded when enough pressure was going
through there?

 

          A.  The
tone sounded so it must have been.

 

          Q.  What if
the pressure switch wasn’t operating correctly and still sounded a tone, do you
know if that can happen?

 

          A.  You
would have to take that up with the technical supervisor.  I do not know the
internal workings.  I’ve only been certified to operate it.

 

          Q.  Right. 
Right.  And so your –– the limits of your ability are to go into the machine,
turn it on, and march it through the steps that you have been trained to do?

 

          A.  Yes.

 

          Q.  But as
far as how that works or the reliability of that specific machine on the date
of November 25th, 2007, the only thing you can say is that that printed out a
result that day?

 

          A.  That is
correct.

 

          Q.  But
whether it was actually working correctly or not as tested by the technical
supervisor as you say on a routine basis, you don’t know that?

 

          A.  It
would have not printed out a result if it hadn’t been operating correctly?
[sic]

 

          Q.  How do
you know that?

 

          A.  ‘Cause
they never have in the past.

 

          Q.  Well,
you’re saying that it can’t print out and be wrong?

 

          A.  You
would have to take that up with a technical supervisor.

 

          Q.  So you
don’t know if it could print out and be wrong, right?

 

          A.  I have
been instructed in class that it will not.

 

          Q.  But you
don’t know that it will or will not so if you get a slip out you’re going to
take that as being true and you don’t really know whether it is or not because
that’s what the technical supervisor’s job is, right?

 

          A.  The
technical supervisor advised us that ––

 

          Q.  No.  I
didn’t ask you ––

 

          A.  –– if
it prints out a result ––

 

          Q.  I’m not
asking what you were told.  I am asking what you can testify to as you sit here
today.

 

          A.  That’s
what I know.  A technical supervisor told me if it printed that out it worked
correctly.

 

          Q.  Okay. 
But if a technical supervisor comes and five days later finds out that that
sample, reference sample, is out of tolerance but yet prints out right they’d
have to go back and invalidate all those test[s], right?

 

          A.  I don’t
know.

 

          Q.  Okay. 
Again, I think I’ve asked you this.  On November 25th, at 1:26 a.m. of 2007,
you don’t know whether –– you can’t sit here and say of your own knowledge that
that Intoxilyzer 5000 was working correctly that morning? 

 

          A.  It
printed out a test sample and it would have given an invalid test if it hadn’t
been working correctly.

 

          Q.  And
that’s because ––

 

          A.  That’s
–– it’s been designed to do that.

 

          Q.  And
that’s really outside of your ––

 

          A.  I
cannot give you the ––

 

          Q.  ––
training?

 

          A.  –– I
cannot give you the internal workings of it, no.

 

          Q.  Okay. 
And so if the pressure switch wasn’t working and so they weren’t getting deep
alveolar air from the lungs of the person in order to test, you don’t know
that?

 

          A.  It
would have kicked out an invalid test.

 

          Q.  Unless
the pressure switch was not working right, correct?

 

          A.  I don’t
believe the pressure switch would have allowed it to do that.

 

          Q.  What do
you mean you don’t believe that?  Do you know that?

 

          A.  Yeah,
I’ve been told if it prints out a test record then the machine is operating
correctly.

 

          Q.  Okay. 
Same thing. So if I ask you, what if the reference sample is out of tolerance
but it prints out close enough but really the true value was different but your
answer is going to be if the test record prints out it’s operating properly?

 

          A.  If the
reference sample is out of tolerance there is a reference sample in there and
we have been trained to replace the reference sample and change it out.

 

          Q.  Yeah. 
But I am saying if it’s supposed to be a certain value but the machine reads it
at a value that’s different than what the real value of it is wrong, you’re
going to say, well, if it prints out, it prints out?

 

          A.  It
wouldn’t print out.

 

          Q.  Oh, it
wouldn’t?

 

          A.  The
instrument would recognize that the reference sample was out of tolerance and
would not –– it would kick out an invalid test and I’d have to ––

 

          Q.  What if
––

 

          A.  –– to
request a blood sample.

 

          Q.  What if
the light source –– ‘cause you’re familiar with infrared spectroscopy, right?

 

          A.  Sure.

 

          Q.  And you
know how that works in the machine?

 

          A. 
Vaguely.

 

          Q.  Okay.

 

          A.  They
gave us a little spin down of it.

 

          Q.  Okay. 
So if the light source is weak and doesn’t produce as much light as it should
and so reads it incorrectly about how much light is being absorbed by the
alcohol molecules in there and prints it out wrong, it’s going to be right
because it prints out, right?

 

          A.  Could
you restate the question?

 

          Q.  Can the
light source ––

 

          A.  You
lost me there.

 

          Q.  Can the
light source be weak and not produce the amount of light that should be in
there and the amount that should be absorbed –– ‘cause you know that’s how they
measure it are the molecules of alcohol that absorb light from one side to the
other, right?

 

          A.  That’s
correct.

 

          Q.  All
right.  So if the light source that comes out of there is weaker and not as
much as absorbs as it should be but it still prints out, it’s still right; is
that right?

 

          A.  I
couldn’t say.  You’d have to talk to a technical supervisor about that.

 

          Q.  But as
far as you know if it prints out it’s right; that’s your answer?

 

          A.  That is what I have been told.

Appellant
re-urged his objection that the proper predicate had not been laid, the
objection was overruled, and the breath-test results were admitted and
published to the jury.

After
the parties had rested and as the trial court recessed the jury to prepare the
charge, one juror asked if the jury would be allowed to look at the evidence of
Appellant’s breath-test results, which had been admitted as State’s Exhibit
Number One.

          JUROR: 
Excuse me, Judge?

          THE
COURT:  Yes?

          JUROR:  Are
we allowed to look at that Exhibit No. 1?

 

          THE COURT: 
Not until you go to the deliberation room.  It has been passed to you once
already.

 

          JUROR: 
Right.

          THE
COURT:  But you can request it at that time.

          JUROR: 
Okay.

During
closing arguments, the prosecutor noted that Appellant was arrested after he
had drifted out of his lane and failed the field sobriety tests.

But the
prosecutor stressed the evidence of the breath-test results.  He observed that
it showed Appellant’s alcohol concentration was almost twice the legal limit,
and he argued that it substantiated the facts obtained at the scene.  Further, he
conceded that it was the “best evidence” of whether Appellant was intoxicated:

And you’ve got a test that’s 40–something minutes, 45
minutes, after the time of driving and that test is .14. That is the best
evidence we have of what –– of whether or not this Defendant was intoxicated.

The
prosecutor also argued that the intoxilyzer was working properly because
Trooper Ward said it was and that Appellant, himself, could have subpoenaed a
technical supervisor:

          That –– the
machine was working properly.  You heard Trooper Ward testify that it was
working properly.  The Defense has the exact same subpoena power that I have. 
They could have subpoenaed the technical breath test operator [sic] also.  But
it’s easier to tell what the State didn’t do than what actually did happen.  I
mean, that’s a .14.

 

The
jury found Appellant guilty and the trial court sentenced him to six months in
jail, probated for six months, and a $2000 fine.

Venue

In
his second point, Appellant raises for the first time the issue whether the
State proved venue, that is, whether the events forming the basis of Appellant’s
conviction occurred in Clay County.  

Unless
an appellant timely disputed venue in the trial court, or unless the record
affirmatively shows the contrary, the rules require that we presume that venue
was proven in the county as alleged in the charging instrument.  See Tex.
R. App. P. 44.2(c); Holdridge v. State, 707 S.W.2d 18, 20–21 (Tex. Crim.
App. 1986).  Appellant did not challenge the State’s proof of venue in the
trial court.  He did not object to the information’s allegation that the
offense occurred in Clay County, he did not cross-examine the State’s witness
on the issue, he did not present evidence showing that the events for which he
was prosecuted occurred in some county other than Clay County (and we have
found none), he did not move for a directed verdict on the ground (or any other
ground) that the State failed to prove venue, he did not object to the jury charge,
he did not argue to the jury that the State had not proven venue, and he did
not move for a new trial.  Accordingly, we hold that Appellant failed to raise
the issue of venue and that the presumption that venue was proved in the trial
court stands.  See Holdridge, 707 S.W.2d at 22.  We overrule Appellant’s
second point.

Breath-Test
Predicate

In
his first point, Appellant contends that the trial court abused its discretion by
admitting the results of his breath test over his objection that the State failed
to lay the proper predicate.  More specifically, he complains that the State
failed to establish that (1) the intoxilyzer machine was functioning properly
on the day of Appellant’s test; (2) the intoxilyzer was periodically supervised
by one understanding the scientific theory behind it; and (3) the results were
interpreted by a witness qualified to do so.  See Harrell v. State, 725
S.W.2d 208, 209 (Tex. Crim. App. 1986).  We agree.

In Harrell,
the court of criminal appeals established the predicate for intoxilyzer-test results,
holding that if the State seeks to introduce the results in evidence the State
must establish: (1) that the machine functioned properly on the day of the test
as evidenced by a reference sample having been run through it; (2) the
existence of periodic supervision over the machine and operation by one who
understands the scientific theory behind it; and (3) proof of the results of
the test by a witness or witnesses qualified to translate and interpret such
results.  See id., at 209–10; Kercho v. State, 948 S.W.2d 34, 37
(Tex. App.––Houston [14th Dist.] 1997, pet. ref’d).

Professors
Dix and Schmolesky have observed that the predicate for breath-test results is
typically met by testimony of two witnesses.  40 George E. Dix &
John M. Schmolesky, Tex. Practice: Criminal Practice & Procedure, §
14:84 (3d ed. 2011); see Reynolds v. State, 204 S.W.3d 386, 387 (Tex.
Crim. App. 2006); Kercho, 948 S.W.2d at 37; Guardiola v. State,
No. 03-08-00399-CR, 2010 WL 1170204, at *3–4 (Tex. App.––Austin Mar. 23, 2010,
no pet.) (mem. op., not designated for publication); Smith v. State, No.
05-96-01724-CR, 1998 WL 908905, at *1 (Tex. App.––Dallas Dec. 31, 1998, pet.
ref’d) (not designated for publication).  The certification framework established
by DPS distinguishes between persons who are certified to administer breath
tests—operators of breath testing devices––and those certified to function in a
supervisory capacity—technical supervisors.  See French v. State, 484
S.W.2d 716, 719 (Tex. Crim. App. 1972) (“[A]n officer may administer a breath
test even though he is not otherwise qualified to interpret the results, and
the standards required to qualify one to administer the test are far less than
those qualifying to interpret the result[.]”); 37 Tex. Admin. Code §§ 19.5
(operator certification), 19.6; (technical-supervisor certification) (West Mar.
26, 2006).  Certification in the latter capacity requires “knowledge and
understanding of the scientific theory and principles as to the operation of
the instrument and reference sample device.”  Id., § 19.6(b)(4).  “Thus,”
Professors Dix and Schmolesky have noted, “a person certified as a technical
supervisor is generally required to meet the second and third requirements of
the Harrell predicate.”  Dix & Schmolesky, § 14:84.  In other words,
the technical supervisor is usually the one who testifies that he or she understands
the scientific theory behind the intoxilyzer; periodically supervises the
intoxilyzer program in the locale where the defendant took the test; has the
qualifications necessary to interpret the results; and actually does so at trial.
See Harrell, 725 S.W.2d at 209–10.

With
these principles in mind, Professors Dix and Schmolesky have outlined the
typical manner in which breath-test evidence is presented at trial:

First, the officer
who administers the test testifies that he is certified as an intoxilyzer
operator, that he administered the test to the defendant and did so in
accordance with the Department’s regulations, and that the results are contained
in a data readout that the State offers as an exhibit.  As part of this
testimony, the operator testifies that he ran a reference test on the
intoxilyzer and what results were produced by this reference test.

 

Second, an officer who was the technical
supervisor with supervisory responsibility for the machine used in the test
testifies that he is certified by the Department as a technical supervisor, the
machine used was certified by the Department for testing purposes, the machine
used was checked periodically to assure that it operated properly, and that the
reference sample used by the officer administering the test was properly
prepared.  This witness generally asserts that he understands the scientific
theory of the device and interprets the numbers on the data readout.  He may
also explain the reference test and what is meant by the results of this
process.

Dix
& Schmolesky, § 14:84.

Here,
Appellant’s argument is that the trial court erred by admitting the results of
his breath test because no one testified that the machine used was certified by
DPS for testing purposes and was checked periodically to assure that it
operated properly or that the reference sample used by the officer
administering the test was properly prepared.  Further, no one asserted any
understanding of the scientific theory of the device, and no one interpreted
the numbers on the data readout.  In fact, whenever Appellant asked any
questions touching on the scientific theory of the intoxilyzer, Trooper Ward
referred him to the technical supervisor.

The
State responds that in order to satisfy the predicate for intoxilyzer results,
it only had to satisfy the three-part Kelly test for reliability of
scientific evidence.  In other words, the State argues that it had to prove by
clear and convincing evidence only that (1) the underlying theory is valid; (2)
the technique applying the theory is valid; and (3) the technique was properly
applied in this case.  See Kelly v. State, 824 S.W.2d 568, 573 (Tex.
Crim. App. 1992); see also Hartman v. State, 946 S.W.2d 60, 63 (Tex.
Crim. App. 1997) (holding that Kelly applies to all scientific evidence). 
Further, the State asserts, it needed only to have proven the third of the Kelly
criteria because, as the court of criminal appeals observed in Reynolds,
the legislature has already determined that the underlying science behind
intoxilyzer testing is valid and that the technique applying it is valid as
long as the test is administered by individuals certified by and using methods
approved by DPS rules.  See Reynolds, 204 S.W.3d at 390.  Thus, the
State argues, in order for the trial court to have properly served its
“gate-keeper” function, it need only have determined that the intoxilyzer
technique was properly applied in this case.

The
State points to Trooper Ward’s testimony that he was certified to administer
the intoxilyzer test, he waited the requisite fifteen-minute period, and he
administered two tests as required by law.

We
do not read Appellant’s claim to contest these aspects of Trooper Ward’s
testimony.  He does not appear to challenge the evidence that Trooper Ward was
qualified to administer the test.  Rather, the rubbing point in this case is
whether the intoxilyzer was maintained by someone with an understanding of the
scientific theory behind it and, more importantly, whether the intoxilyzer was
operating properly on the day that Appellant submitted to testing.

On
this latter point, the State offers up Trooper Ward’s testimony that he knew
the machine was operating properly because otherwise “it would have kicked out
a negative results [sic] saying it was not working properly.”  This begs the
question––as Appellant’s counsel put to the trooper at numerous points on voir
dire––what if the machine was not working properly but still printed a result
that was plausible but inaccurate?  Trooper Ward’s response to questions along
these lines varied from denying the premise to suggesting that counsel subpoena
the technical supervisor.  It started with the first question:

Q.  Trooper Ward, can
you give us a scientific basis for the operation of the Intoxilyzer 5000?

 

A.  No.  You would
have to subpoena a technical supervisor for that.

 

And
it continued:

Q.  Do you know if it
was tested to determine whether the –– the known sample was correct or not?

 

A.  If it wasn’t, the
technical supervisor would have previously taken it out of service and replaced
it with another intoxilyzer.

 

. .
. . . 

Q.  What if the
pressure switch wasn’t operating correctly and still sounded a tone, do you
know if that can happen?

 

A.  You would have to
take that up with the technical supervisor. . . .  I’ve only
been certified to operate it.

 

. .
. . .

Q.  But whether it
was actually working correctly or not as tested by the technical supervisor as
you say on a routine basis, you don’t know that?

 

A.  It would have not
have printed out a result if it hadn’t been operating correctly[.]

 

Q.  How do you know
that?

 

A.  ‘Cause they never
have in the past.

 

Q.  Well, you’re
saying that it can’t print out and be wrong?

 

A.  You would have to
take that up with a technical supervisor.

 

. .
. . .

Q.  All right.  So if
the light source that comes out of there is weaker and not as much as absorbs
as it should be but it still prints out, it’s still right; is that right?

 

A.  I couldn’t say. 
You’d have to talk to a technical supervisor about that?

 

Q.  But as far as you
know if it prints out it’s right; that’s your answer?

 

A.  That is what I have been told.

We
review the trial court’s decision to admit scientific evidence for an abuse of
discretion, which means that we will not disturb it if the ruling was within
the zone of reasonable disagreement.  Bigon v. State, 252 S.W.3d 360,
367 (Tex. Crim. App. 2008).

We
are not persuaded by the State’s assertion that Trooper Ward’s testimony was
sufficient because “[e]vidence of one who holds a DPS’ certification is
sufficient to meet the Kelly criteria.”  The State cites Reynolds
for this assertion, but omits an important qualifier from that opinion:  the
complete sentence from Reynolds is, “The fact of certification is
sufficient to meet the Kelly criteria with respect to the competence
of the breath test operator.”  204 S.W.3d at 390 (emphasis added).  As we
have indicated, Appellant does not challenge Trooper Ward’s competence as an
operator.

Moreover,
the issue and the critical facts in Reynolds differ from those presented
in this case.  There, the issue was whether the operator of the breath-testing
apparatus was required to understand the scientific and technological
principles behind the device.  Id. at 387.  The court of criminal
appeals held that the operator need not demonstrate such understanding.  Id.
at 391.  And, importantly for our purposes, in Reynolds the State was
able to produce another witness, a certified technical supervisor who was
responsible for overseeing the particular intoxilyzer the trooper in that case
operated.  Id. at 387.  The technical supervisor testified that she was
familiar with the science and technology upon which the device was based and
that she had first-hand knowledge that it was maintained and in good working
order on the date the trooper used it to test the appellant.  Id. 
Similar testimony is what the State failed to produce here.

While
we defer to the trial court’s implied determination that Trooper Ward was
credible, we hold that it was outside the zone of reasonable disagreement for
the trial court to have concluded from the trooper’s testimony, credible though
it may have been, that the State had shown by clear and convincing evidence
that the intoxilyzer had been properly maintained by someone who understood the
science behind it and that it was operating properly on the day of Appellant’s
breath test.  Accordingly, we hold that the trial court abused its discretion
by admitting the breath-test results in evidence.  See Harrell, 725
S.W.2d at 209.

Having
held that the trial court abused its discretion, we must determine whether the
error affected Appellant’s substantial rights.  Tex. R. App. P. 44.2(b).  A
substantial right is affected when the error had a substantial and injurious
effect or influence in determining the jury’s verdict. Morales v. State,
32 S.W.3d 862, 867 (Tex. Crim. App. 2000) (quoting King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997)).

Upon
review of the entire record, we are left with no fair assurance that the trial
court’s error did not affect the jury’s deliberations or had but a slight
effect.  See Bagheri v. State, 119 S.W.3d 755, 763 (Tex. Crim. App.
2003).  The jury was instructed that it could find that Appellant had been
intoxicated if it found that he had lost normal use of mental or physical
faculties by reason of the introduction of alcohol into the body, or if he had
an alcohol concentration of 0.08 or more.  The record shows that Trooper Ward
pulled Appellant over late one night after observing his car weave twice from
its lane.  Appellant pulled over appropriately and without incident.  Trooper
Ward determined after administering field sobriety tests that Appellant was
intoxicated.  The breath test subsequently administered at the jail showed that
Appellant’s breath alcohol concentration was nearly twice the legal limit, a
fact that the State emphasized during closing argument.  In fact, the State
advised the jury that the breath-test evidence was the “best evidence” that
Appellant was intoxicated, conceding that evidence that Appellant had lost
normal use was weaker.  Even before deliberations, one juror asked whether the
jury would be allowed to see the exhibit showing the breath-test results. 
Given the record before us, we cannot say that the trial court’s erroneous
admission of the breath-test results did not affect the jury’s deliberations or
had but a slight affect.  See Bagheri, 119 S.W.3d 755. 
Accordingly, we sustain Appellant’s first point.

Conclusion

Because
we hold that no reasonable view of the record supports the trial court’s
conclusion that the intoxilyzer had been properly maintained and was properly
operating when Appellant gave a breath sample, and because the record gives us
no fair assurance that the error did not affect the jury’s deliberations or had
but a slight effect, we sustain Appellant’s first point, reverse the judgment,
and remand for a new trial.

 

 

LEE GABRIEL
JUSTICE

 

PANEL: 
DAUPHINOT,
WALKER, and GABRIEL, JJ.

 

PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  November 21,
2012









[1]See Tex. R. App. P. 47.4.